Bradley T. Cave, P.C.
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
P O. Box 1347 (82003)
Cheyenne, WY 82001
Telephone: (307) 778-4200
Facsimile: (307) 778-8175

Christopher E. Moore
Christine M. White
Erin R. Wedge
Coats|Rose
One Canal Place
365 Canal Street -Suite 800
New Orleans, LA  70130
Telephone:  (504) 299-3076
Facsimile:  (504) 299-3071

ATTORNEYS FOR DEFENDANT
PATHFINDER ENERGY SERVICES, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| DENNIS CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 08-CV-282D |
| | ) | |
| PATHFINDER ENERGY, | ) | |
| and RICH ARNOLD | ) | |
| | ) | |
| Defendants | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and LR 7.1(b)(2), Pathfinder Energy Services, Inc., (incorrectly named "Pathfinder Energy") (hereinafter "Defendant" or "Pathfinder") respectfully submits the following Brief in Support of its Motion for Summary Judgment on Dennis Carter's (hereinafter "Plaintiff" or "Carter") claims.

1

## I.    STATEMENT OF FACTS

1.    Carter was employed by Pathfinder as a directional driller ("DD") in Casper, Wyoming until January 1, 2007.  [Carter Depo. p. 9, ll. 8-10, p. 195, ll. 24-25, p. 196, ll. 1-2].

2.    Carter began working as an employee of Pathfinder on December 31, 2004.  [Carter Depo., p. 12, ll. 16-23].  He had provided directional drilling services to Pathfinder as a contractor since May 2004 prior to becoming an employee.  [Carter Depo., p. 12].

3.    Rich Arnold ("Arnold"), operations manager for Pathfinder's Rocky Mountain District, hired Carter and was Carter's supervisor throughout his employment.  [Arnold Depo., p. 19-20].

4.    Carter was first diagnosed with diabetes in approximately 2003, before he began working for Pathfinder.  [Carter Depo., p. 53].

5.    Pathfinder knew Carter had diabetes when he was hired.  [Carter Depo., p. 50]. Carter also spoke with Arnold about his diabetes at some point during his employment, immediately after which there was no change in the terms of his employment.  [Carter Depo., p. 51-52].

6.    Carter was able to perform his job as a directional driller with Pathfinder with diabetes. He claims that he could do so "up until around October" 2006, but admits that he was still working in October 2006.  [Carter Depo., p. 57]. In fact, Carter was working up until his employment was terminated in December.  [Carter Depo., p. 58, ll. 4-6]. Moreover, Carter admitted he could, and indeed did, work 24-hour shifts in November and December 2006.  [Carter Depo., p. 87-88].

7.    Carter claims that he could perform his job in October 2006 "with accommodations." "The accommodations were - - in November, December, I only worked I think it was nine days in November and ten days in December, and the reason for working those few of days in the month was my medical condition."  [Carter Depo., p. 58, ll. 7-12].

8.    Carter had previously provided contract directional drilling services for a company called Directional Plus, where he had issues with the personnel.  [Carter Depo., p. 14].  Because of an altercation Carter had with one of Directional Plus' contract MWD[1] hands sometime in 2004, Carter was "let go" from Directional Plus.  [Carter Depo., p. 16-17]. Carter pushed the MWD during the row.  [Carter Depo., p. 19, ll. 17-21].

---

[1] MWD stands for Measurement While Drilling.

9.     Steve Walker, Pathfinder directional drilling coordinator, testified that during his employment Carter would become hostile and screamed profanity at an MWD hand.[2] [Walker Depo. p. 52]. Walker also testified that Carter would yell at another MWD hand and became verbally aggressive with both MWDs "shouting profanities, cursing people." [Walker Depo. p. 67].

10.     Chris Syverson, one of the MWD hands subjected to Carter's outbursts, confirmed that Carter yelled at him frequently and also witnessed Carter arguing with other employees. [Syverson Depo. p. 49 and pp. 78-79].

11.     Prior to Carter's termination, Arnold verbally counseled Carter because of an altercation he had with another employee on the rig site. Carter was also intoxicated on the job site during that incident. [Carter Depo. pp. 92-99]; [Arnold Depo. pp. 146-147].

12.     On December 22, 2006, Carter was working on a Pathfinder job for Yates Petroleum to be completed on December 23, 2006.

13.     Carter spoke with Arnold on the evening of December 22, 2006, and Arnold told him that he needed Carter to go to another job for Ultra Petroleum. Carter said, "Okay. I'll head that way in the morning." [Carter Depo. p. 102, ll. 2-5].

14.     The next morning, on December 23, 2006, Carter called Arnold and told him he wasn't feeling good and didn't feel up to going to the Ultra job. Arnold said: "Well, I guess I'll call Dave and let him know you're not going to be there to help him." In response, Carter said he would "f[uckin]g go," and abruptly hung up the telephone on Arnold. [Carter Depo., p. 102, ll. 13-25].

15.     Carter had an altercation with an MWD on the site of the job for Ultra Petroleum. Carter arrived to the site after the MWD and took the bunk that the MWD had selected for himself. When confronted by the MWD, Carter claims he said: "Well, … it don't make a F[uck] to me." [Carter Depo., p. 76-77].

16.     On December 24, 2006, Carter called Arnold and told him that he was sick and Arnold said "Okay. Go ahead and come on in [from the ultra job], but I need to talk to you [in the office] the day after Christmas." Arnold wanted to discuss Carter's working relationship with his fellow employees and Pathfinder. [Carter Depo., p. 100, ll. 8-11]. Carter became angry and hung up on Arnold for the second time.

---

[2] Walker was a directional driller during Carter's employment. [Walker Depo. p. 13].

17.   Carter did not meet with Arnold on December 26.  [Carter Depo., p. 101, ll. 16-18].

18.   On December 27, 2006, Arnold called Carter and again asked him to come to Arnold's office.  Carter again became angry and hung up on Arnold for the third time, but finally showed up to meet with Arnold.  [Arnold Depo., Ex. 13].

19.   After discussing the incident involving the MWD on the Ultra job with Carter, Arnold informed Carter that he could not get along with anybody and he had to terminate Carter's employment.  [Carter Depo., p. 78, ll. 13-20].  Arnold told Carter nobody wanted to work with him because he was grouchy and too hard to get along with.  [Carter Depo., p. 79].

20.   Pathfinder communicated the termination of Carter's employment to him on December 27, 2006, and  the termination was made effective on January 1, 2007.  [Carter Depo., p. 73; Arnold Depo. Ex. 2].

21.   Arnold explained the situation with Carter to Pathfinder Human Resources and they concluded Carter's behavior constituted gross misconduct.  [Arnold Depo. p. 150].

22.   Plaintiff testified that "part of the reason for [him] being probably grouchy was [his] diabetes was out of control at the time of his termination.  [Carter Depo. p. 79, ll. 4-17].

23.   Carter stopped taking medication to control his diabetes at least from September 2006 to December 2006.  [Carter Depo. pp. 79-81].  Carter went without a physician and failed to take the medications necessary to control his diabetes during this time.  [Carter Depo., p. 80, ll. 17-25, p. 81, ll. 17-19].

24.   After already testifying about his conversation with Arnold on December 23, Carter later "remembered" that during that call, he "mentioned to [Arnold] that I may need to take short-term, long-term disability.  And I wondered for a while why I had said this: You just can't take those benefits away.  If you do – you guys can't just take those benefits away.  If you do, I'll see you guys in court.  And [Arnold's] remark to me was, "You won't see me in court."  And that's when I said, "Well, whatever, Rich, and I hung up.  [Carter Depo., p. 106, ll. 1-8].

25.   Up until the time his employment was terminated, Carter was able to do his job as a directional driller.  [Carter Depo., p. 87, ll. 23-25, p. 88, ll. 1-6].

26.   Approximately 3 months prior to the termination of his employment, Carter asked office manager Lois Svyrko how disability benefits were paid and she informed him that the

4

company paid the premiums. [Carter Depo., p. 117-118]. Carter claims that he did not apply for short-term or long-term disability at this time because he was still able to work. [Carter Depo. p. 118, ll. 1-3].

27.    Carter felt that he would have qualified for short term disability in November and December 2006, but he did not ever apply for that benefit. [Carter Depo., p. 126].

28.    Carter did not apply for disability benefits in December 2006 or at any other time during his employment. [Carter Depo., p. 110].

29.    The last job Carter held was with Pathfinder and he has not sought employment since he left Pathfinder. [Carter Depo., p. 9, ll. 8-19].

30.    When asked whether his diabetes substantially limited him from doing anything he considered to be a major life activity during his employment with Pathfinder, Carter testified that his diabetes (and what he later realized was Hepatitis) caused him not to get enough sleep and made him tired. [Carter Depo. p. 150]. He also testified that he had deterioration of feelings in his hands. [Carter Depo. p. 151].

31.    Carter attested to the Social Security Administration that his total disability onset date was December 27, 2006. [See Social Security Administration Records, CARTER-SSA 000008].

32.    During his employment with Pathfinder, Arnold called Carter into his office to discuss an incident in which Carter was drinking on the job site and had an altercation with another worker. [Carter Depo. pp. 95-99]; [Arnold Depo. pp. 146-147].

33.    When asked what Carter thought the term accommodation meant, he testified: "Accommodations to me was providing a second driller on location so I wouldn't have to work 24 hours a day . . . and accommodations of being able to rest when I was wore out after a job, in between jobs." [Carter Depo. p. 129, ll. 21-25, p. 130, ll. 1-5]. Carter admits that there are directional jobs that one man can do and others that require you to work every hour and a half. He feels "anybody should be accommodated that doesn't want to stay up for two or three days at a time." [Carter Depo., p. 129-130].

34.    Carter admits that there are some jobs where a customer will only pay for one driller on the jobsite. [Carter Depo., p. 131].

35.    Carter claims he asked Arnold to provide a second driller on jobs on which he was assigned and that Arnold provided a second driller unless drillers were unavailable.

Carter did not ask for any other thing he calls an accommodation.  [Carter Depo., p. 135, ll. 9-25].

36.     Carter was not disabled.

> Q:  "Mr. Carter, at any point between your hire as an employee at Pathfinder and then ultimately your termination from Pathfinder, was there anytime that you were not capable of performing the essential functions of your job as a directional driller?"
>
> A:  No.
>
> Q:  You could do the work?
>
> A:  Yeah. . . .  [Carter Depo., p. 149, ll. 6-13].

37.     Carter alleges in his Complaint that he became totally disabled "after the first of the year 2007."  [First Amended Complaint at ¶ 53].[3]  He then testified that in May 2007, it became impossible for him to work.  Carter's termination was effective January 1, 2007, and he did not try to seek employment anywhere between January 1 and May 2007, because he was "too sick to work."  [Carter Depo., p. 195-196].

38.     On January 3, 2005, Carter signed his employment application for employment with Pathfinder.  [Carter Depo. Ex. 5].  Above the signature line in bold print is the following statement:

> **I understand and agree that nothing contained in this application, or conveyed during any interview, is intended to create an employment contract.  I further understand and agree that if I am hired, my employment will be "at will" and without a fixed term, and may be terminated at any time, with or without cause and without prior notice, at the option of either myself or the Company.  No promises regarding employment have been made to me, and I understand that no such promise or guarantee is binding upon the Company unless made in writing.**  [Carter Depo. Ex. 5].

39.     Carter received a copy of Pathfinder's employee handbook upon his employment with Pathfinder.  [Carter Depo. p. 120].  Carter signed a receipt for the employee handbook on December 31, 2004.  [Carter Depo. Ex. 4].  Pathfinder's employee handbook contains an Introduction which clearly states, in pertinent part:

---

[3] Carter swore under oath to the Social Security Administration that he onset of his disability was December 27, 2006.

There are several things that are important to keep in mind about this handbook; it contains only <u>general information and guidelines</u>. It is not intended to be comprehensive or to address all possible applications of or exceptions to, the general policies and procedures described. . . . <u>Neither this handbook nor any other Company document, confers any contractual right, either express or implied, to remain in the Company's employ</u>. Nor does it guarantee any fixed terms and conditions of your employment. Your employment is not for any specific time and may be terminated <u>at will</u>, with or without cause and without prior notice, by the Company or you may resign for any reason at any time. (emphasis added). [Carter Depo. Ex. 3].

40. The <u>separate</u> receipt for the employee handbook signed by Carter contains the following statements:

I understand that Pathfinder is an "at will" employer and as such my employment with Pathfinder is not for a fixed term or definite period and may be terminated at the will of either party, with or without cause, and without prior notice. . . . I understand that nothing contained in the Handbook may be construed as creating a promise of future benefits or a binding contract with Pathfinder for benefits or for any other purpose. [Carter Depo. Ex. 4].

41. Pathfinder's Employee Handbook contains a provision entitled Gross Misconduct which provides, in part:

An employee will be summarily dismissed if it is established, after a proper investigation, that there has been an act of gross misconduct or poor performance that warrants termination. [Carter Depo. Ex. 3].

Under this provision, gross misconduct includes fighting, gross insubordination, and excessive offensive and/or abusive bad language or behavior. [Carter Depo. Ex. 3].

42. Pathfinder did not administer the short-term or long-term disability or other benefits provided to their employees. These benefits were administered by Pathfinder's former parent corporation W-H Energy Services, LLC. [Vassallo Depo. p. 59].

43. Neither Pathfinder nor Rich Arnold had anything to gain by allegedly depriving Carter of short-term or long-term disability benefits.

## II.     LAW AND ARGUMENT

### A.     Carter Cannot Establish a *Prima Facie* Case of Discrimination Under the ADA.[4]

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate "'(1) that [he] is disabled within the meaning of the ADA; (2) that [he] is qualified-with or without reasonable accommodation; and (3) that [he] was discriminated against because of [his] disability.'" *McKenzie v. Dovala*, 242 F.3d 967, 969 (10th Cir. 2001) (*quoting Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir.1998)).  Carter cannot establish a *prima facie* case of discrimination since he was not disabled nor was he regarded as disabled.  Moreover, Carter was not discriminated against because of any alleged disability.

#### 1.     Carter was Neither Disabled nor "Regarded As" Disabled

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  During his employment with Pathfinder, Carter was not disabled under any of these definitions under the ADA.[5]

##### a.     Carter Did Not Have a Physical Impairment that Substantially Limited Any Major Life Activity.

To qualify as "disabled" under the first definition of disability under the ADA, Carter must demonstrate that he had a "physical or mental impairment that substantially limits one or more of [his] major life activities. . . ."  29 C.F.R. 1630.2(g)(1).  Whether a plaintiff has an impairment under the ADA and whether the identified activity is a major life activity are

---

[4] Congress passed the ADAAA in 2008 and the new law became effective January 1, 2009,  significantly expanding the definition of "disabled" under the ADA.  However, Circuit courts to address the issue of retroactive application of the ADAAA have held that Congress did not intend the law to apply retroactively.  *See, e.g. Lytes v. DC Water and Sewer Authority*, 572 F.3d 936 (D.C. Cir. 2009); *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, n. 8 (5th Cir. 2009).  Notably, the Department of Labor has also taken the position that the law should not apply retroactively and it appears that the Equal Employment Opportunity Commission agrees.  All relevant events at issue in this lawsuit occurred prior to the enactment of the ADAAA and are governed by the pre-amendment ADA.

[5] Since the termination of his employment with Pathfinder, Plaintiff has become totally disabled, and has been declared totally disabled by the Social Security Administration.  He swore to the federal government that his total disability onset date was December 27, 2006.  Plaintiff then alleged in his Complaint that he became totally disabled "after the first of the year 2007."  He then testified that in May 2007, it became impossible for him to work.  Carter's termination was effective January 1, 2007, and he did not try to seek employment anywhere between January 1 and May 2007, because he was "too sick to work."  [Carter Depo., p. 195-196].  Thus, as of December 27, 2006, Plaintiff is no longer qualified for his position as a directional driller.

questions of law for the court. *Doebele v. Sprint/United Mgmt. Co*., 342 F.3d 1117, 1129 (10th Cir. 2003).

### (i)      Major Life Activity.

Carter alleges that he "has been diagnosed with Hepatitis C[6] and diabetes" and that "[t]hese diseases affected the major bodily functions of the immune system, and the digestive system of the Plaintiff." [First Amended Complaint at p. 11, ¶ 69]. Plaintiff claims "they also constitute a substantial limitation on the liver, and other major bodily systems as well." [First Amended Complaint at p. 11, ¶ 69]. Although Carter concludes that his "disease qualifies as a physical or mental impairment that substantially limited one or more of Plaintiff's major life activities" in his Complaint, Plaintiff does not actually identify a "major life activity" that was substantially limited by his alleged impairment.[7]

The disease's alleged impact on Plaintiff's immune and digestive system may show that Plaintiff had a physical impairment, but it does not show what major life activities were substantially limited. It is important to distinguish the difference between the concept of "impairment" and "major life activity." In *Furnish v. SVI Systems, Inc.*, 270 F.3d 445 (7th Cir. 2001), the court rejected the plaintiff's allegations that his Hepatitis B impairment was a disability because it substantially limited the major life activity of "liver function." The court held that "liver function" is not a major life activity, but is simply "a characteristic of the impairment, much as a decline in white blood cells is a characteristic of the HIV virus." *Id*. at 449-450. The court noted that the activities that have been held to be major life activities under the ADA are not the impairment's characteristics - - they are the activities that have been impacted because of the plaintiff's impairments. *See also, Swart v. Premier Parks Corp*., 88 Fed.Appx. 366 (10th Cir. 2004)(noting plaintiff's argument confused "impairment" with "major life activity."). Here, Carter simply states that his "liver" and "other major bodily systems" were affected.

---

[6] Carter was not diagnosed with Hepatitis C until after the termination of his employment. He can present no evidence whatsoever that Defendant knew of his Hepatitis C or any alleged effects of the disease during his employment with Pathfinder. Indeed, Carter's condition did not deteriorate to where he was unable to work until immediately after the termination of his employment.

[7] In his Complaint, Plaintiff alleges that between September and December 2006 he became weak, had neuropathy in both legs, lost weight, and experienced flu-like symptoms. [First Amended Complaint at ¶ 23]. Articulation of these conditions does not show a substantial limitation in a major life activity. Moreover, Plaintiff worked during this entire period and therefore cannot demonstrate these "impairments" were substantially limiting as discussed below.

When asked whether his diabetes substantially limited him from doing anything he considered to be a major life activity during his employment with Pathfinder, Carter testified that his diabetes (and what he later realized was Hepatitis) caused him not to get enough sleep and made him tired. [Carter Depo. p. 150]. He also testified that he had deterioration of feelings in his hands. [Carter Depo. p. 151]. Again, these are characteristics of impairments and not major life activities. Without more, Carter has failed to identify a major life activity substantially limited by any "impairment."

(ii)    <strong>Substantial Limitation.</strong>

The EEOC regulations define "substantially limits" as being either "[u]nable to perform a major life activity that the average person ... can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1620.2(j)(1)(i) & (ii).

It is Plaintiff's burden to demonstrate how his impairment substantially limited a major life activity. Again, Plaintiff does not identify what major life activity was allegedly impaired. Moreover, Plaintiff cannot demonstrate any substantial limitation of any major life activity. *See*, *e.g. Lawler v. Quicktrip Corp.,* 172 Fed. Appx. 873 (10th Cir. 2006)(employee did not produce enough evidence to show she was substantially limited in walking or standing where she did not "present the necessary comparative evidence."); *Steele v. Thiokol Corp*., 241 F.3d 1248 (10th Cir. 2001)(court considered whether plaintiff was substantially limited in sleeping because of obsessive compulsive disorder; plaintiff claimed he was often awake during night, but court noted he was not substantially limited because he "offered no evidence that his sleep problems made it difficult for him to go to work and do his job well or affected his overall health in a severe or permanent manner."). Carter cannot identify any major life activity that was substantially limited by his physical impairment or how any alleged limitation compares to that of the average person. Indeed, as he admitted under oath and without qualification, Carter was able to perform the essential functions of his job as a directional driller during the entirety of his employment. [Carter Depo., p.149, ll. 6-13].

Plaintiff claims his health deteriorated between the months of September and December 2006. [First Amended Complaint at ¶ 23]. Plaintiff admits that he was not taking medication to control his diabetes at least since September 2006. He went without a physician and the

10

necessary medications to control his diabetes during the September 2006 to December 2006 time frame. [Carter Depo., p. 80-82]. Plaintiff testified that "part of the reason for [him] being probably grouchy was [his] diabetes was out of control at the time of his termination. [Carter Depo. p. 79, ll. 4-17].

The determination of whether an individual is disabled - that is, whether his impairment substantially limits a major life activity-is "made with reference to measures that mitigate the individual's impairment." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). In *Sutton*, the Supreme Court clarified that "[a] 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might', "could", or 'would' be substantially limiting *if mitigating measures were not taken*." *Sutton*, 527 U.S. at 482 (emphasis added). Since Plaintiff stopped using the mitigating measures that helped to control his diabetes, he cannot use any adverse impact that had on his health to claim that he was disabled under the ADA.[8]  *See also, Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516 (1999) (finding courts must evaluate person in medicated state in order to determine whether he is disabled under ADA and holding plaintiff was not disabled under ADA because his hypertension did not substantially limit his major life activities when he was medicated).[9]

Plaintiff cannot demonstrate that he experienced a substantial limitation of any major life activity. Thus, Plaintiff is not disabled within the meaning of the first definition of disability under the ADA, and his ADA claims must fail as a matter of law.

**b.      Pathfinder Did Not Regard Carter As Disabled.**

Carter alleges that Pathfinder regarded him as disabled "in the major life function of working when it terminated his services in December 2006." [First Amended Complaint at ¶ 72]. When a plaintiff asserts a "regarded as" claim, the focus is on the employer's subjective beliefs about the plaintiff's impairment. "To prevail on a regarded-as claim, a plaintiff must show that an employer has mistaken beliefs about the plaintiff's abilities: the employer 'must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.'" *Jones*

---

[8] Furthermore, Plaintiff cannot ignore his medical regimen and then attempt to blame the behavior that caused his employment to be terminated on his alleged impairment.

[9] Whether Plaintiff claims his diabetes or his later diagnosed Hepatitis C or both were the alleged impairments, he still cannot show that either caused a substantial limitation of any major life activity during his employment with Pathfinder. [Carter Depo. p. 10, ll. 5-9].

11

*v. United Parcel Service, Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007) (*citing Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999)).

It is not enough to show that an employer perceived an employee as having some limitations; rather, a plaintiff must show that the employer believed he was substantially limited in a major life activity. "To be substantially limited in a major life activity, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004) (internal quotation marks omitted) (emphasis omitted) (*citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 524 U.S. 184, 198 (2002)). Accordingly, to state a valid "regarded as" claim, Carter must show that Pathfinder believed he was prevented from or severely restricted in performing a major life activity, such as walking, working or caring for himself. Carter has no such evidence.

"[I]n order to establish a disability under the 'regarded as' prong of the ADA with respect to the major life activity of working, an individual must show that the employer regarded him or her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes." *Steele v. Thiokol Corp*., 241 F.3d 1248, 1256 (10th Cir.2001); *accord Sutton v. United Air Lines, Inc*., 527 U.S. 471, 491 (1999). Here, Carter cannot demonstrate that Pathfinder found him to be so limited. In fact, Pathfinder hired Carter for a full-time position knowing he had diabetes. Further, Pathfinder continued to schedule Carter for a number of jobs over his two-year employment. Pathfinder scheduled Plaintiff for work up until 3 days before his termination. It was not until Carter's behavior became intolerable that Pathfinder was forced to terminate his employment. Pathfinder made no determination that Carter could not perform his job as a directional driller or any other job, for that matter.

Carter cannot show that Pathfinder regarded him as substantially limited in performing either a class of jobs or a broad range of jobs in various classes. Carter cannot establish that he is "disabled" under this prong of the ADA. There is no evidence indicating that Pathfinder believed Carter was substantially limited in any major life activity. Accordingly, Carter does not fall within the category of "regarded as disabled" individuals covered by the ADA, and his ADA claims must fail as a matter of law.

2.      **Qualification.**

Plaintiff was qualified for his position as a directional driller during his employment with Pathfinder.  Plaintiff admits he could do his job up until the time he was terminated. [Carter Depo., p. 87, ll. 23-25, p. 88, ll. 1-6).  However, in his application for Social Security disability benefits, Plaintiff claimed he became totally disabled on December 27, 2006; the last day he worked.  Consequently, Plaintiff is no longer qualified for his position and has not been since the day of his termination.  Since Plaintiff is no longer qualified, his *prima facie* case fails.

3.      **Carter is Not a Victim of Discrimination.**

a.      **Carter Did Not Seek Any Accommodation Nor Was He Entitled to Any Accommodation.**

Carter claims Pathfinder "failed to accommodate [him] by terminating his services in December 2006."  [First Amended Complaint at ¶ 73].  This allegation is nonsensical. Nevertheless, Carter never sought, nor did he actually need, any accommodation for any alleged disability during his employment with Pathfinder.

> Q:  "Mr. Carter, at any point between your hire as an employee at Pathfinder and then ultimately your termination from Pathfinder, was there anytime that you were not capable of performing the essential functions of your job as a directional driller?"

> A:  No.

> Q:  You could do the work?

> A:  Yeah. . . . [Carter Depo., p. 149, ll. 6-13].

Carter later testified that he was able to perform his job as a directional driller "up until around October" 2006, but admits that he was still working in October 2006.  [Carter Depo., p. 57].  In fact, Carter was working up until his employment was terminated in December.  [Carter Depo., p. 58, ll. 4-6].  Moreover, Carter admitted he could, and indeed did, work 24-hour shifts in November and December 2006.  [Carter Depo., p. 87-88].

To the extent Carter needed some accommodations, he admits he received them.  Carter testified that he could perform his job in October 2006 "with accommodations."  "The accommodations were - - in November, December, I only worked I think it was nine days in

November and ten days in December, and the reason for working those few of days in the month was my medical condition." [Carter Depo., p. 58, ll. 7-12]. This schedule was arranged by Arnold, the very person Carter alleges to have victimized him. Arnold testified that Plaintiff worked less during this time because he sought and was granted vacation. Regardless, Plaintiff's own testimony reveals that he received what he thought was a reasonable accommodation.

Carter also testified "accommodation" was providing a second driller on location so that he would not have to work 24 hours and being able to rest in between jobs. Carter admits that there are directional jobs that one man can do and others that require you to work every hour and a half. [Carter Depo., p. 129-130]. Carter admits that there are some jobs where a customer will only pay for one driller on the jobsite. [Carter Depo., p. 131]. Carter claims he asked Arnold to provide a second driller on jobs on which he was assigned and that he provided a second driller unless drillers were unavailable. [Carter Depo., p. 135, ll. 9-25]. Therefore, to the extent Carter required some accommodation to perform his job, his own testimony unequivocally establishes such accommodations were provided.

Assuming, *arguendo*, that Carter was entitled to some other type of reasonable accommodation, he is not entitled to the accommodation of his choice, but rather one that is reasonable and does not cause an undue hardship on the employer. *Butler v. Wal-Mart Stores, Inc.*, 202 F.3d 281 (10th Cir. 1999)( ADA does not require an employer to create new position or even modify essential function of existing position in order to accommodate disabled worker; *see also Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (ADA does not limit employer's ability to establish functions of job). Carter testified that he did not ask for any other accommodation than those he admitted were provided. [Carter Depo., p. 135, ll. 20-25].

### b.    Carter's Employment Was Not Terminated Because of Any Disability.

To prove that Pathfinder violated the ADA, Plaintiff must prove that he was terminated because of his alleged disability. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees ....") (emphasis added). As discussed, Carter was neither disabled nor regarded as disabled. Nevertheless, he cannot demonstrate that Pathfinder terminated his employment because of his disability.

14

Pathfinder terminated Carter's employment because he was unable to get along with people. [Arnold Depo. p. 100]. Arnold terminated Carter's employment because of his argument with the MWD Engineer on Christmas Eve and his attitude. Carter abruptly hung up the telephone on his supervisor three times in the days leading up to his termination. [Arnold Depo. Ex. 13]. Plaintiff admits that Arnold told him he was being fired because of his inability to get along with others. Plaintiff also admits he hung up the phone on Arnold and used profanities in speaking with him in the days leading up to his termination. Plaintiff's admitted behaviors constitute gross misconduct under Pathfinder's employee handbook. Plaintiff has no evidence, just his own conclusion, that his employment was terminated because of a disability. Indeed, Plaintiff cannot name a single non-disabled directional driller who engaged in similar behavior but was not terminated.[10]

### B.     Carter Cannot Establish Any Violation of ERISA.

In his Complaint, Plaintiff claims that Pathfinder interfered with ERISA-protected rights and that he "was terminated in order to avoid the exercise of his rights under [ERISA-covered] plans in violation of 29 U.S.C. § 1140." [First Amended Complaint, at ¶ 65]. Plaintiff claims he "qualified for coverage under Pathfinder's short-term and long-term disability plans" and that "Plaintiff qualified for continued protection under the company's medical insurance program" and that he was terminated in order to avoid the exercise of his rights under those plans. [First Amended Complaint, ¶¶ 62-65]. However, there is no evidence that Pathfinder interfered with any rights of Plaintiff.

29 U.S.C. § 1140 provides in pertinent part that it:

> shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. 29 U.S.C. § 1140. . . . . The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

---

[10] Arnold hired Plaintiff knowing he had the very condition Plaintiff claims led to the termination of his employment.

To prevail under 29 U.S.C. § 1140 (also known as § 510), an employee must demonstrate that the defendant had the specific intent to interfere with his ERISA rights. *Cunningham v. Adams*,106 Fed. Appx. 693, *4 (10th Cir. 2004)(*citing Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993)). The employee can satisfy his burden by relying on either direct or circumstantial proof of the defendant's intent. *Id.*, *citing Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998) (en banc). Plaintiff can produce no direct evidence[11] of intent to interfere with his ERISA rights and thus must rely on circumstantial evidence.    Thus, the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 (1973) applies and Plaintiff must demonstrate a *prima facie* case. *See Winkel v. Kennecott Holdings Corp.*, 3 Fed. Appx. 697 (10th Cir. 2001)(applying the *McDonnell Douglas* analysis to a § 510 claim).

> **1.    Plaintiff Cannot Establish a *Prima Facie* Case of Interference with ERISA Benefits.**

To establish a *prima facie* case of interference with ERISA benefits, Plaintiff must prove that: (1) he was entitled to ERISA protection; (2) he was qualified for his position; and (3) he was discharged under circumstances that give rise to an inference of discrimination. *Clark v. Coats & Clark*, 990 F.3d 1217, 1222 (11th Cir. 1993). Plaintiff must demonstrate by a preponderance of the evidence that his termination was motivated by Pathfinder's <u>specific intent</u> to interfere with benefits protected by ERISA. *Trujillo v. Pacificorp*, 524 F.3d 1149, 1160 (10th Cir. 2008), *citing Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993).

First, Plaintiff can present no evidence that he actually qualified for short-term or long-term disability benefits.[12]   As a Pathfinder employee, he was eligible to make claims according to those plans, he cannot demonstrate that he would have actually qualified to receive benefits

---

[11] Direct evidence is evidence which proves the fact (here, that Defendant had specific intent to interfere with ERISA rights) without inference or presumption. *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990). Plaintiff has no evidence other than his self-serving statement that he said if Pathfinder tried to take his benefits away he would see Arnold in court and Arnold's response that he would not see him in court. These alleged statements would not prove that Defendant had the specific intent to interfere with ERISA rights without a major inference or presumption.

[12] Since Plaintiff failed to make application for short-term disability or long-term disability benefits, he simply cannot recover those benefits in this lawsuit. "[A]n ERISA cause of action accrues when an application for benefits is denied." *Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197, 1205 (10th Cir.1990). "Therefore, exhaustion of administrative (i.e., company- or plan-provided) remedies is an implicit prerequisite to seeking judicial relief." *Id.* at 1206. Plaintiff did not follow the claim procedure set out in the plan – he never applied for benefits, so he was never denied benefits. Thus, an ERISA claim for benefits never accrued. Moreover, as discussed elsewhere, the recovery of benefits is not an available remedy since Plaintiff's only claim under ERISA is under § 510.

1477332.1/006625.000034

under either of the plans.  Indeed, Plaintiff cannot recover under those plans without exhausting plan remedies, which he did not do.  Moreover, Plaintiff's diabetes was a pre-existing condition that he voluntarily chose not to treat.  Pursuant to the terms of Pathfinder's long-term disability plan, these factors would have likely have disqualified Plaintiff for coverage.[13]

Plaintiff also cannot produce evidence that interference with ERISA rights was a motivating factor in his termination.  Plaintiff claims on December 23, 2006, he told Arnold that "you guys can't just take those benefits away.  If you do, I'll see you guys in court."  Carter claims Arnold responded "you won't see me in court."  [Carter Depo., p. 105-106].  However, these statements do not establish a specific intent to interfere with ERISA rights. They simply reflect Arnold's opinion that he would not "see Carter in court" over benefits he had nothing to do with administering.

In no way do these words suggest intent by Arnold to take any action with regard to Plaintiff's employment or his alleged benefits.  In fact, it was not until Arnold's conversation with Carter four days later on December 27, when Carter hung up on Arnold for the third time in a few days, that Arnold decided "that was the straw" that led to his decision to terminate Carter's employment.  [Arnold Depo. Ex. 4].  Plaintiff cannot present sufficient evidence to demonstrate that Pathfinder had specific intent to interfere with his benefits; thus, Plaintiff cannot sustain a *prima facie* case.

## 2.    Plaintiff Cannot Demonstrate Pretext.

Assuming, *arguendo*, that Plaintiff can sustain his *prima facie* case (which he cannot), the burden shifts to the Defendant to articulate a legitimate and non-discriminatory reason for terminating Plaintiff.  *Trujillo*, 524 F.3d at 1158.  Pathfinder's proffered explanation for terminating Plaintiff – his inability to get along with his co-workers and his insubordinate behavior with Arnold – are legitimate and non-discriminatory reasons for termination and meet Pathfinder's light burden of production.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-510, (1993).  Thus, the burden shifts back to Plaintiff to show that this proffered reason is pretextual

---

[13] It is not this Court's responsibility to interpret the terms of the short-term and long-term disability plans under which Plaintiff was covered to determine whether he would have qualified for benefits.  This simply highlights why Plaintiff's assertion that he is entitled to "restoration of benefits" for his § 510 claim is entirely improper.  Moreover, if whether Plaintiff qualified or did not qualify for benefits were properly before this Court, the proper Defendant would not be Pathfinder, and any claim for benefits ought to be dismissed under *Fed. R. Civ. P*. 19(a).  W-H Energy Services, LLC was the administrator of these plans and the only proper party defendant to a claim for benefits.  *Garren v. John Hancock Mut. Life Ins. Co*., 114 F.3d 186 (11th Cir. 1997)(proper party defendant in action concerning ERISA benefits is party that controls administration of the plan).

and that the true reason was to interfere with Plaintiff's receipt of ERISA benefits.  *Clark*, 990 F.2d at 1222.  Plaintiff must show that the loss of benefits was more than a mere consequence of his termination.  *Seaman v. Arivida Realty Sales*, 985 F.2d 543, 546 (11th Cir. 1993), *cert. denied*, 510 U.S. 916 (1993).  He cannot make this showing.

In *Gandleman v. Aetna Ambulance Service*, Gandleman was terminated for misappropriating company property. 48 F.Supp. 2d 169, 171 (D. Conn. 1999).  Gandleman sued Aetna and alleged a § 510 violation of ERISA, alleging that Aetna knew about his significant health problems and upcoming kidney transplant, and argued that Aetna terminated him to obtain less expensive health care coverage.  *Id*.  The court held that the record did not support a finding that Aetna's proffered reason for terminating Gandleman was unworthy of belief or motivated by Aetna's intent to discriminate against Gandleman.  *Id*. at 174, *citing Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988).  The court held that even if it were to assume that Gandleman did not steal company property and that he was a valuable employee, nothing in the record suggested that the individuals who terminated him did not have a good faith belief that Gandleman had stolen company property or that the story was fabricated to avoid liability.  *Id*. at 174-75.  Even if Aetna was mistaken about whether Gandleman stole company property, it did not lead to the conclusion that Aetna discriminated against Gandleman to obtain less expensive health coverage.  *Id*. at 175.  Evidence that an employer made a poor business judgment in discharging an employee is generally insufficient to create a genuine issue of material fact to the credibility of the defendant's reasons for termination.  *Id*., *citing Dister*, 859 F.2d at 1116.  The court held that "[t]he scant evidence offered by plaintiff amounts to no more than his subjective beliefs and debatable inferences" which were not enough to create a genuine issue of material fact.  *Id*.

In this case, Plaintiff can only cite his statement that Pathfinder could not take benefits from him.  In light of Plaintiff's behavior preceding his termination, this statement does not constitute evidence of a specific intent to deprive Plaintiff of disability benefits.

Like *Gandleman*, the scant evidence of Plaintiff's self-serving statements amount to a subjective belief that Arnold was attempting to interfere with Plaintiff's application for disability benefits.  Even if Arnold knew that Plaintiff planned to apply for disability benefits, Plaintiff is still required to offer some evidence that this knowledge somehow influenced Arnold in his decision to terminate Plaintiff.  *See Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 42 (1st

1995) (holding that specific intent to interfere with ERISA benefits could not be inferred from employer's alleged knowledge that employee was in the process of applying for disability benefits at the time of termination).  Since Arnold had nothing to do with the administration or award of these benefits, Plaintiff cannot make this showing.

### 3.    The Relief Sought by Plaintiff is Not Available.

Plaintiff cannot obtain the relief he seeks against Defendant under ERISA.  In his First Amended Complaint, Plaintiff seeks judgment against Defendant for violations of ERISA as follows:  (1) damages sufficient to make Plaintiff whole through restoration of benefits; (2) lost wages and other economic benefits; (3) judicial interest; and (4) attorneys' fees and costs.  [Rec. Doc. 20, at p. 13].  However, Plaintiff is precluded from seeking benefits because he brings this claim under § 510, *i.e.* a claim for the intentional interference with benefits, which is not a claim for benefits.  "[R]elief for § 510 is found *only* in § 502(a)(3)."  *Hicks-Wagner v. Qwest, Inc.*, 462 F.Supp.2d 1163, 1169 (D.N.M. 2006) (emphasis in the original) (*citing Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197 (10th Cir. 1990)).  In *Held*, the Tenth Circuit described the two distinct causes of action and ensuing relief under ERISA and held that a cause of action under § 510 entitles a plaintiff to equitable relief and not benefits.  *Held*, 912 F.2d at 1203; *see also*, *Spinelli v. Gaughan*, 12 F.3d 853, 857 & n. 3 (9th Cir. 1993) (noting that "§ 502 - the remedies provision for section 510 - provides only for equitable relief"); *Hicks-Wagner*, 462 F.Supp.2d at 1170.

Here, as in *Hicks-Wagner*, Plaintiff only asserts a § 510 claim against Defendant, which precludes Plaintiff from seeking a claim for ERISA benefits under § 502(a)(1)(B) or any other legal remedy.  *See Callery v. U.S. Life Ins. Co.*, 392 F.3d 401, 405 (10th Cir. 2004), *cert denied*, 546 U.S. 812, 126 S.Ct. 333, 163 L.Ed.2d 46 (2005); *Millsap et al v. McDonnell Douglas Corp.*, 368 F.3d 1246 (10th Cir. 2004) (holding that backpay is not available as "appropriate equitable relief" under § 502(a)(3)(B)); *Lind v. Aetna Health, Inc.*, 466 F.3d 1195 (10th Cir. 2006) (holding that equitable relief under § 502(a) precluded plaintiff's request for restitution of lost wages, exacerbation of plaintiff's medical condition, pain and suffering, and punitive damages).

The exclusive remedy to a plaintiff alleging a claim under 29 U.S.C. §1140 is codified at 29 U.S.C. § 1132(a)(3).  *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1247 (10th Cir .2004) ("Section 502(a)(3) of ERISA provides the plan participant with his exclusive remedies for a §  510 violation.")); *Held v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1203 (10th

Cir.1990) ("If discharging [the plaintiff] was 'unlawful' under § 1140 [i.e., § 510], plaintiff was entitled to bring (and did bring) an action for declaratory and injunctive relief under 29 U.S.C. § 1132, which authorizes [the relief set forth in ERISA § 502(a)(3) ]."). Under 29 U.S.C. §1132(a)(3), Plaintiff may only seek injunctive relief and appropriate equitable relief for any alleged §510 claim against Defendant. Plaintiff seeks no equitable relief on his ERISA claim, only monetary damages. Thus, Plaintiff's efforts to seek these remedies from Defendant fail as a matter of law.[14]

### C.     Carter Cannot Establish a Claim for Breach of an Implied-In-Fact Contract of Employment.

Plaintiff cannot prevail on a claim for breach of an implied-in-fact contract of employment. Plaintiff claims that the policies contained in Pathfinder's employee handbook constitute an implied-in-fact contract of employment, and that he was terminated from his employment without cause. [First Amended Complaint at ¶ 65]. However, Pathfinder makes it clear to its employees that it does not intend to create an employment contract with them. Regardless, Plaintiff was terminated for gross misconduct, which would constitute cause.

"In Wyoming, employment for an indefinite time is presumed to be a contract for at-will employment which either party can terminate at any time for any or no reason." *Terry v. Pioneer Press, Inc*., 947 P.2d 273, 275 (Wyo.1997). An employee may overcome the at-will presumption by showing that the parties created an implied-in-fact contract, modifying the employee's at-will status. *Brodie v. General Chemical Corp*., 934 P.2d 1263, 1265 (Wyo.1997). A conspicuous and unambiguous disclaimer, in the employment application or subsequent relevant documents, places an employee on notice that general statements or conduct do not promise employment security and are not to be relied upon by the employee. *Lincoln v. Wackenhut Corp*., 867 P.2d 701, 703 (Wyo.1994).

As set forth in paragraph 38 of Defendant's Statement of Facts, on January 3, 2005, Carter signed his employment application containing a bold-print disclaimer and statement of at-will employment immediately preceding his signature. [Carter Depo. Ex. 5]. Carter also received an Employee Handbook and signed a <u>separate</u> acknowledgment of his receipt of the handbook. Both of these documents also contain conspicuous disclaimers of any intent to create contractual rights. [See Statement of Facts at ¶¶ 39-40]. The separate receipt for the employee

---

[14] This Court has already found in this case that "lost wages and other economic benefits" constitute legal remedies which are not appropriate forms of relief under ERISA § 502(a)(3). [Document No. 64, p. 9].

handbook signed by Carter clearly states: "I understand that Pathfinder is an <u>"at will"</u> employer and as such my employment with Pathfinder is not for a fixed term . . . ." [Carter Depo. Ex. 4].

Pathfinder made its intent clear to Carter – there was no contract of employment.  Several documents Carter received and acknowledged contain unambiguous disclaimers.  Carter was indisputably on notice that Pathfinder's general statements or conduct did not promise employment security and were not to be relied upon by him.  An employee cannot reasonably rely on the conduct or statements of an employer if he has been sufficiently informed that his employment is at will.  *Lincoln*, 867 P.2d at 703.  The provisions contained in the various Pathfinder documents provided to Carter are unambiguous and plainly demonstrate Pathfinder's intent to maintain the at-will status of its employees.  Accordingly, no reasonable person, including Carter, could reasonably believe that the handbook promised job security.  Carter cannot present evidence that would rebut the presumption that his employment was at will.  Defendant is entitled to judgment as a matter of law on Carter's claim for breach of an implied-in-fact contract.

Moreover, assuming Pathfinder's handbook is an implied contract, (which it is not) Pathfinder did not breach that contract.  The reasons for Carter's termination constitute gross misconduct as defined by Pathfinder's Employee Handbook.  [See Statement of Facts at ¶ 41, and Carter Depo. Ex. 3, p. 48].  Under this provision, gross misconduct includes fighting, gross insubordination, and excessive offensive and/or abusive bad language or behavior.  [Carter Depo. Ex. 3, p. 48].  These are all behaviors which Carter admits to have engaged.  Therefore, his termination was not without cause and did not violate any alleged implied contract.

**D.    Carter Cannot Establish a Claim for Violation of the Covenant of Good Faith and Fair Dealing.**

Carter contends that Pathfinder breached "the duty of good faith and fair dealing."  [First Amended Complaint at ¶ 81].  Wyoming recognizes a limited tort claim for breach of an implied covenant of good faith and fair dealing in employment contracts.  *Springer v. Blue Cross and Blue Shield of Wyoming*, 944 P.2d 1173 (Wyo. 1997)(*citing Loghry v. Unicover Corp.*, 927 P.2d 706, 712 (Wyo.1996)).  "Only in those <u>rare and exceptional</u> cases in which a special relationship of trust and reliance exists between the employer and employee is a duty created which can give rise to tort liability.  A special relationship sufficient to support a cause of action can be found by

the existence of separate consideration, rights created by common law or statute, or rights accruing with longevity of service." *Id.* (internal citations omitted)(emphasis added).

Carter cannot establish a claim for violation of the covenant of good faith and fair dealing since he cannot establish a special relationship with Pathfinder. Usually, the special relationship giving employees an action on the implied covenant of good faith and fair dealing stems from a long-term employment relationship coupled with a discharge calculated to avoid employer responsibilities to the employee. The duration of an employment relationship over a period of years is not sufficient, alone, to give rise to a special relationship. *Brown v. Holy Name Church*, 80 F.Supp.2d 1261 (D. Wyo. 2000)(*citing Garcia v. UniWyo Federal Credit Union*, 920 P.2d at 646 (citations omitted).

First, Plaintiff did not have a long-term employment relationship with Pathfinder. Plaintiff was employed with Pathfinder for only two years and provided contract services for only a few months prior to becoming an employee. This length of employment cannot establish the requisite "special relationship." *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211 (Wyo. 1994)(finding insufficient longevity in plaintiff's three years of employment with employer or other bases to establish a special relationship).

Carter suggests that a special relationship of trust and reliance existed between him and Pathfinder by virtue of the affirmative duties imposed by the ADA.[15] However, as discussed above in the analysis of Plaintiff's claims under the ADA, Plaintiff is not "disabled" for the purposes of the ADA. Therefore any affirmative duties imposed on employers by the ADA would not create a special relationship of trust and reliance between Plaintiff and Pathfinder. *McMullin v. Ashcroft*, 337 F.Supp.2d 1281, 1292-93 (D. Wyo. 2004)(finding no special relationship existed where plaintiff did not demonstrate he was disabled as defined by the ADA).

Thus, Plaintiff cannot show that there was a "special relationship of trust and reliance" supporting his claim for breach of the implied covenant of good faith and fair dealing.[16] There are no rare and exceptional circumstances that give rise to the type of "special relationship of trust and confidence" as is contemplated by the Wyoming cases. Plaintiff can present no

---

[15] Plaintiff also alleged that the FMLA provided the requisite special relationship. However, Plaintiff's FMLA claims were dismissed as he acknowledged that he was not an eligible employee under the FMLA.

[16] To the extent Plaintiff may suggest that his ERISA claim provides the requisite "special relationship" for this claim, such an effort will be unsuccessful. ERISA actually preempts Plaintiff's good faith/fair dealing claim. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) (holding that ERISA preempts state law wrongful discharge claim based on termination to avoid pension fund payments).

evidence to suggest an improper motive, egregious conduct or overreaching on the part of Pathfinder so as to characterize the decision to terminate Plaintiff's employment as an act of bad faith.

Assuming Plaintiff could establish a special relationship, his claim still fails.   As described herein, Plaintiff's employment was terminated for gross misconduct and not to deprive him of some earned benefit.  Thus, Plaintiff's claim for breach of implied covenant of good faith and fair dealing must fail.  *See e.g., Andrews v. Southwest Wyoming Rehabilitation Center*, 974 P.2d 948 (Wyo.1999); *Terry v. Pioneer Press, Inc.*, 947 P.2d 273 (Wyo.1997). Defendant is entitled to summary judgment in its favor on the breach of the covenant of good faith and fair dealing claim.

### E.      Plaintiff Cannot Recover Economic Damages Due to His Inability to Work Since December 27, 2006.

Plaintiff is not entitled to any economic damages.  Assuming *arguendo* that Plaintiff could survive summary judgment on any of his claims, he is not entitled to recover back pay or front pay because his complete and total inability to work since December 27, 2006 forecloses on recovery of these economic damages.  *See Gamboa v. Henderson*, 240 F.3d 1074 (5th Cir. 2000) (holding that the district court erred in awarding Gamboa front and back pay because economic damages are inappropriate if a plaintiff claims that she is disabled and unable to work), *citing Saulpaugh v. Monroe Cty. Hosp.*, 4 F.3d 134, 145 (2nd Cir. 1993) (denying award of back pay for period in which plaintiff was disabled).

## III.   CONCLUSION

For the above-stated reasons, Defendant respectfully requests that the Court grant its motion for summary judgment and seeks judgment in favor of Defendant, dismissing with prejudice Plaintiff's claims in their entirety.

DATED this 1st day of October, 2010.

/s/ Christopher E. Moore

Christopher E. Moore
Christine M. White
Erin R. Wedge
Coats | Rose
365 Canal Street - Suite 800
New Orleans, LA  70130
Telephone:  (504) 299-3076
Facsimile:  (504) 299-3071

and

Bradley T. Cave, P.C., WY Bar No. 5-2792
Holland & Hart LLP
2515 Warren Avenue, Suite 450
Cheyenne, WY  82003-1347
Telephone:  (307) 778-4200
Facsimile:  (307) 778-8175
Electronic Mail: bcave@hollandhart.com

ATTORNEYS FOR DEFENDANT PATHFINDER
ENERGY SERVICES, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing Defendant's Brief in Support of Its Motion for Summary Judgment to be served via the Court's Electronic Filing/Notification System, to the following:

Jeffrey C. Gosman, Esq.
Frank R. Chapman, Esq.
Chapman Valdez
Beech Street Law Office
125 W. 2nd Street
Post Office Box 2710
Casper, Wyoming 82602-2710
Facsimile: (307) 577-1871
Electronic Mail:  jeff@gosmanlawoffices.com
frc@bslo.com

Dated this 1st day of October, 2010.

/s/ Christopher E. Moore