Jeff Gosman,
and Frank Chapman
CHAPMAN VALDEZ
Attorneys & Counselors at Law
125 W. 2nd Street
Post Office Box 2710
Casper, Wyoming 82602-2710
307-237-1983
307-577-1871 (facsimile)

Attorneys for the Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Dennis Carter, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-cv-282D |
| | ) | |
| vs. | ) | |
| | ) | |
| Pathfinder Energy, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW,** the Plaintiff, by and through counsel, **JEFF GOSMAN, AND FRANK CHAPMAN OF CHAPMAN/VALDEZ,** and responds to the Defendant's Motion for Summary Judgment as follows:

### *Factual Background*

Dennis Carter was employed by Pathfinder Energy beginning on December 31, 2004 as a directional driller.  *Appendix One: Carter Depo page 12, lines 16-19.*[1]  He obtained a copy of the employee handbook which he reviewed before he was hired.  *Carter Depo page 121 line 2 – page*

---

[1]  Hereafter, Appendix One will be referred to as the Carter Deposition.

*122, line 2.*  He understood that Pathfinder was required to follow the disciplinary policy before he

could be terminated. *Id.*

The disciplinary policy of the employee handbook which is found on page 48 of Exhibit 3

to the Dennis Carter Deposition and attached as Appendix Two is set out as follows:

**Disciplinary Procedure**

Pathfinder requires good conduct, attendance and satisfactory standards of job performance from its employees.  If these standards are not being met, the following disciplinary procedures will be applied to try to correct the area(s) of concern.

Minor cases should be dealt with informal counseling between the employee and his/her first line supervisor. However, where the matter is more serious or repetitive the following procedure should be used:

**Verbal Warning**- For minor breaches of discipline, or failure to achieve satisfactory standards.  A note of the conversation should be made and retained by the supervisor.

**Written Warning**- For serious or repetitive breaches of discipline or failure to meet standards.  The written warning will consist of details of the offense, corrective action that is required and the timeline in which it must be made, and consequences if the deficiency is not corrected.  The Written Warning should be signed by both parties.

**Final Written Warning**- If there is still a failure to improve, and conduct and performance is still unsatisfactory, OR if the misconduct is sufficiently serious to warrant only one written warning (but not serious enough to require dismissal) a Final Written Warning will be given to you.  The Final Written warning will consist of details of the offense, corrective action that is required and the timeline in which it must be made, and consequences if deficiency is not corrected.

**Dismissal**- If conduct or performance is still unsatisfactory or misconduct is sufficiently serious to warrant, then Dismissal will be the result.

**Gross Misconduct**

**An employee will be summarily dismissed if it is established, after a proper investigation, that there has been an act of gross misconduct or poor performance that warrants termination.**

Includes but is not limited to the following:

   ♦       Fighting, violent conduct or dangerous horseplay.
   ♦       Gross insubordination.

- ♦ Excessive offensive and/or abusive bad language or behavior.
- ♦ Theft or willful damage to Company Property.
- ♦ Falsification of Company records (including timesheets, commission claims, expense reports, benefits paperwork etc)
- ♦ Fraud or any other offense committed against the Company that is a violation of the law.

This disciplinary policy creates clear expectations for how discipline will be handled, and indicates that its application is mandatory. Carter specifically believed that the disciplinary policy would be followed. *Carter Depo page 120, lines 5-12 and page 122, lines 14-24.* Mr. Carter believed that the employee handbook was a contract. *Carter Depo page 199, line 11 – page 200, line 5.*

There are several disclaimers to the employee handbook. The disclaimers associated with the handbook are not conspicuously drafted to highlight or set apart the right of the company to discharge an employee without cause.

1. The introduction to the handbook contains a general welcoming provision that promises a dynamic and rewarding workplace, a notice that the handbook contains general information only, that it is confidential and that some of the subjects are treated more fully in the company's policy manuals. In the middle of the text is a disclaimer that no contract of employment is created, and that the employment may be terminated with or without cause and without notice. *See page 7 of Exhibit 3 to the Carter Depo attached as Appendix Two.*

2. The Receipt for the handbook which Mr. Carter signed on the day he became an employee of Pathfinder Energy acknowledged receipt of the handbook and its review, contained the directive to present any questions to the director of human resources for the company, commented that the handbook does not promise anything concerning future benefits and that its policies may be amended or terminated. Again, placed inconspicuously in the middle of the text is the at will disclaimer. *See Exhibit 4 to the Carter Deposition, Appendix Two.*

Mr. Carter started his employment with the company on Friday the 31st of December, 2004.

*Carter Depo page 12, lines 16-19*.  All of the company paperwork indicates he was an employee of Pathfinder Energy effective 12/31/2005.  *See Appendix Three: Rich Arnold Depo page 51, line 23 – page 52, line 13, Exhibit 7*.[2] He was oriented on that date and given approximately nineteen forms to sign, including the receipt of handbook.  *Arnold Depo page 53, lines 10-19*.  Lois, the administrative assistant, gave him the packet of information and "flipped" through it showing Mr. Carter where to sign.  *Appendix Four: Unsworn Declaration of Dennis Carter*.[3] He was not given a chance to read the documents.  *Id*.

On Monday, the 3rd of January, 2005, the company realized that it didn't have an application for employment from Mr. Carter, and he was told to fill out the form so they would have it on record.  *Id*.  Mr. Carter had been performing contract services as a directional driller for a year for Pathfinder when he was hired as a full time employee.  *Carter Depo page 40, lines 15- 23*.  Mr. Carter was led to believe that the application for employment was simply a formality, since he had already been offered and had accepted the job. *Carter Unsworn Declaration*.  The at-will disclaimer contained in that document is buried in the last paragraph under the misleading heading "Authorizations," which provision allows the company to perform drug tests and medical examinations.  *See Arnold Depo Exhibit 7, page 2, bate stamp 0009*.

During the year Mr. Carter was a contract driller he had no disciplinary problems with Pathfinder Energy, *Carter Unsworn Declaration*, and on December 31st, 2004 was hired by

---

[2]     Hereafter, Appendix Three will be referred to as the Arnold Deposition.

[3]     Hereafter, Appendix Four will be referred to as the Carter Unsworn Declaration.

Pathfinder as a full time employee for his maturity and his experience. *Carter Depo page 69, lines 17-24; Carter Unsworn Declaration*. During the two years he worked as a full time employee with Pathfinder, from 2004 to 2006, he had no disciplinary issues that merited either a either verbal or written warning. *See Carter Depo page 72, line 12 – page 73, line 5*.

Carter was fired on the 27th of December, 2006 for gross misconduct. His supervisor, the firing official, stated that he was fired for gross misconduct surrounding events related to his last two days of employment. *Rich Arnold Depo page 162 line 20 – page 163 line 22*. His supervisor made clear in his deposition that the complaints of co-workers, collected several months after Carter was terminated had nothing to do with the decision to terminate him. *Rich Arnold Depo page 148 lines 12-16*. Carter was fired because: 1) of the incident on the Ultra job where he was accused of saying "F you" to an MWD hand; and, 2) because he hung up on Mr. Arnold and cussed at him in the two preceding days.

Gross Misconduct is a basis for immediate termination under the employee handbook. The Defendant relies on the employee handbook in its justification for the termination of the Plaintiff.

### DEFENDANT'S REASONS FOR TERMINATING PLAINTIFF ARE PRETEXTUAL

Carter states that these reasons were pretextual. At the outset, Plaintiff denies that he hung up on Mr. Arnold, Plaintiff's supervisor, before he was terminated. Dennis Carter had a phone conversation with Mr. Arnold on the 23rd of December, 2006 in which he made the statement that the company could not take his disability benefits away from him. The conversation was at an end when Mr. Carter hung up the phone. *Carter Unsworn Declaration; Carter Depo page 125, line 21–*

*page 126, line 8.* This was the only instance where Mr. Carter could have been deemed to have hung up on Mr. Arnold, and it didn't happen as Arnold suggested. *Carter Unsworn Declaration.*

### DENNIS CARTER WAS DISABLED

Carter had worsening Diabetes and an emerging Hepatitis C starting in the late fall of 2006 that required him to take time off. Mr. Carter's supervisor, Rich Arnold, was notified of the illness and Mr. Carter's worsening physical condition regularly through the fall of 2006. *Carter Depo page 162, line 6 – page 164, line 18.* His friends and coworkers were also aware of his deteriorating health during the fall of 2006. *Carter Depo page 164, line 23 – page167, line 4.* One of them, Donna Messerli, visited with Rich Arnold and told him how poorly Dennis Carter felt and that she didn't think he was ready to go out on a job at that time. *See Appendix Five: Donna Messerli Depo page 29, line 17 – page 30, line 5.* Between the months of September and December 2006, Plaintiff became increasingly weak, had neuropathy in both legs, lost significant body weight, fatigued easily and experienced episodes of flu-like symptoms. *Carter Depo page 162, lines 6-12.* He specifically told Mr. Arnold that he was over-fatigued, and was seeking a doctor. *Carter Depo page 171, line 19 – 172, line 5.* Mr. Carter saw a physician in early December who conducted blood work and informed him that something was wrong with his liver. Mr. Carter reported this information to his supervisor, Rich Arnold, in early December and informed him that he may need more time off. *Carter Depo page 172, line 20 – page 173, line 14.* As early as July of 2006, Mr. Carter requested an accommodation in the form of a second driller on location. *Carter Depo page 134, line 18-25.* Mr. Carter understood when he requested time off and a second driller on location because of the

extent of his illness that it was a request for an accommodation.  *Carter Depo page 129, line 21 – page 130, line 9.*

According to the report of Plaintiff's expert witness, John Janzen, the Plaintiff, while able to work with accommodation, was significantly impaired in the life activities of work, caring for oneself, performing manual tasks and other major life activities during the last quarter of 2006.  *See Janzen Report, Appendix Six.*[4]  By November and December of 2006, Mr. Carter needed assistance shopping, eating, performing basic housekeeping duties, lifting, performing manual tasks such as buttoning his shirt, tying his shoes, and help with personal hygiene.  *Id.*  Mr. Carter was accommodated in November and December by allowing him time off to rest between jobs.  *See Carter Depo page 206, lines 5-13.*  He had been coming off jobs and sleeping for a week or ten days at a time by November and December of 2006.  *Carter Depo page 157, lines 8-17.*  Mr. Carter stated that at no time prior to the date he was fired was he unable to perform the essential functions of his job as a directional driller if he had time off to rest between jobs.  *Carter Depo page 149, lines 6– through page 150 line 8.*

### DENNIS CARTER'S DIABETES HAS NOT BEEN CONTROLLED BY MEDICATION

Carter's regular physician quit his practice and Dennis was without a physician to treat his Diabetes for a time in the fall of 2006.  *Carter Depo page 81, line 1 – page 82, line 19.*  He had been effective in the past controlling his Diabetes by working and watching his diet.  *Carter Depo page 81, lines 1-8*, and had only irregularly taken medication in the past.  *Appendix Seven: Dr. Ryan*

---

[4]       Appendix Six will be referred to as the Janzen Report.

*Declaration and Report.[5]* He located Dr. Cummings in the late fall of 2006. *Carter Depo page 81,*

*line 20 – page 82, line 3,* and started taking medication to control Diabetes again. The medication

has proved ineffective in controlling his Diabetes. *Id.* During this period, it was the Hepatitis C,

which was as yet undiagnosed, that was producing the most severe symptoms. *Carter Depo page*

*150, lines 9-16.* He described the symptoms of his Hepatitis C during this period as feeling

poisoned. *Cater Depo page 194, lines 4-17.*

### THE PRETEXT ISSUE

Plaintiff worked a ten day job in December for a company called Yates Petroleum. *Carter*

*Depo page 174, lines 17-22.* On the evening of the 22nd of December, 2006, Mr. Carter was

informed that he needed to report to another job with Ultra Petroleum the next day. *Carter Depo*

*page 101, line 25 – page 102, line 16.* At first, Mr. Carter agreed. However, by the next day, he was

too sick to work and reported to his employer that he was coming home, he was sick. *See Carter*

*Depo page 175, lines 2-8.* When he reported to his supervisor that he couldn't work, Mr. Arnold

tried to shame him into working by telling him he would have to tell the other driller that he would

be working alone. *Carter Depo page 176, lines 7-14.* Mr. Carter responded by saying "No, Rich,

I'll fucking go." *See Carter Depo page 176, line 16 – page 177, line 5.* This statement was not

made in anger and the use of the swear word was, in the context of the oilfield, language that was

commonly exchanged in every day speech. *Id.* Mr. Carter testified that the statement was made in

resignation – "I'm sick, and I'm still going to have to go"– rather than in anger. *Carter Depo page*

---

[5]        Appendix Seven will be referred to as the Ryan Report.

*177, lines 6-12.*  Mr. Carter was not swearing at Mr. Arnold.  He also informed Mr. Arnold that when he got back to town he would produce a letter from a physician that, at that time, he was unable to work. *Carter Depo page 102, line 24 – page 103, line 4.*  He said "Rich, I have been sick and you know I have been sick." *Id.*  Mr. Arnold responded, "Well, Dennis, you have had more days off than anybody." *Carter Depo page 102, line 24 – page 103, line 6.*  Mr. Carter then told Mr. Arnold that he may need short term and long term disability. *Carter Depo page 105, line 21 – page 106, line 2.*  He then added, "You can't take those benefits away.  If you do, I'll see you in court." *Carter Depo page 105, line 21 – page 106, line 5.*  Mr. Arnold replied, "You won't see me in court." *Carter Depo page 105, line 21 – page 106, line 6,* to which Mr. Carter said, "Well, whatever Rich." *Carter Depo page 105, line 21 – page 106, line 7.*

When Mr. Carter arrived at the Ultra job, he went to bed right away. *Carter Depo page 76, lines 12-21.*  He moved a pair of pants that the MWD hand (Measure While Drilling), who also worked for Pathfinder,  had placed on the lower bunk to the upper bunk and laid his sleeping bag down on the lower bunk and went to sleep. *Id.*  When he got up that evening the MWD hand was upset that Dennis had taken his bunk. *Carter Depo page 76, line 12 – page 77 line 1.*  The other directional driller on the site informed the MWD hand that the directional driller gets the choice over which bed they are going to take. *Carter Depo page 76, line 12 – page 77 line 4.*  Dennis informed the MWD hand that he ". . . didn't give a - - it don't make a F to me.  I can go into town and get a motel room, you know." *Carter Depo page  77, lines 5-9.*  The MWD hand had just come off a job for 40 hours straight, *Carter Depo page 77, lines 12-17,* and was likely in a debilitated mental state

himself at the time.  There was no conflict, and Carter assumed the matter was over.

Mr. Carter spent the night at the rig site and the next morning he called Rich Arnold and told him that he had blood in his urine and was too sick to work.  *Carter Depo page 178, line 7-11.*  Mr. Arnold said he needed to see Dennis Carter the day after Christmas.  *Carter Depo page 178, lines 12-18.*  Mr. Carter called Rich Arnold the day after Christmas, but Mr. Arnold was  not in the office.  *Carter Depo page 178, lines 15-18 and page 179 lines 12-24.*  The next day, the 27th, Mr. Arnold called the Plaintiff at home and told him he needed to come to the office that day.  Dennis Carter informed him he was very sick, but Arnold insisted that he come down that day.  *Carter Depo page 178, line 19 – page 179, line 11.*  When Dennis Carter came into the office on the 27th of December, 2006, Mr. Arnold asked him if he told an MWD hand to "F off" at the Ultra job site.  *Carter Depo page 75, lines 5-8.*  Dennis Carter said no, and explained that the MWD hand had been upset that Dennis had taken the lower bunk and that he, Dennis Carter, had responded it didn't matter to him, he would go into town and get a hotel room.  *Carter Depo page 75 line 12 – page 77, line 16* and *Carter Depo page 78, lines 1-10.*  The Defendant, Pathfinder Energy has failed to produce either the MWD hand or Ken Wheeler, the directional driller who was on location at the time to confirm Arnold's version of these key events.

Mr. Arnold then told the Plaintiff that he couldn't get along with anybody and he had to terminate him. *Carter Depo page 78, lines 13-20.*  Dennis Carter informed Arnold that if he was grouchy it was probably due to his diabetes being out of control. *Carter Depo page 78, line 13 – page 79, line 17.*  Arnold then mentioned that the other drillers were working 25-26 days a month

and he felt they would start quitting. *Carter Depo page 84, line 23 – page 85, line 14*. Mr. Arnold also mentioned that Plaintiff could not work 24 hour shifts, saying – "Well, you can't work 24 hour shifts, so there you go." *Carter Depo page 87, lines 10-16*. In fact, Mr. Carter could work 24 hour shifts and had been working those shifts in both November and December. *Carter Depo page 87, line 23 – 88, line 6*. Mr. Arnold asked Plaintiff what was wrong with him and Mr. Carter responded by telling him that he didn't know, but that he had blood work pending. *Carter Depo page 84, lines 15-20*. Mr. Carter informed Arnold that he had been to the doctor just the day before, that additional blood tests had been performed, and that there was something wrong with his liver. *Carter Depo page 88, line 14 – page 89, line22*. Mr. Carter asked Arnold if he could avoid firing him and let him find out what was wrong with him so that he could keep his medical benefits, to which Arnold replied that he was terminated. *Carter Depo page 93, lines 1-8*.

When Mr. Carter went to work for Pathfinder he enrolled in the company's disability insurance program. *Carter Depo page 49, lines 4-11*. The disability policy was ERISA qualified. *Appendix Eight: Lisa Vassallo Depo page 61, line 8 – page 62, line 8*.[6] Mr. Carter understood that he lost his eligibility for benefits under the policy when he was terminated. *Carter Depo page 110, line 20 – page 111, line 7*. In fact, the disability policy does terminate eligibility upon termination from employment. *See Exhibit 3 of the Vassallo Depo, introduced at page 59. Specifically, page 15 of the Disability Policy*.

In January of 2008, Dennis Carter learned that he had Hepatitis C. *Carter Depo page 193,*

---

[6]    Hereafter, Appendix Eight will be referred to as the Vassallo Deposition.

*lines 22-24.*  He began Interferon treatment in May.  *Carter Depo page 195, lines 6-23.*  Dennis Carter testified that he could have worked up to the time he started interferon treatment in May of 2007. *Carter Depo page 195, line 6 – page 196, line 22.*  Dr. Chris Ryan, M.D. who performed an examination of the Plaintiff and a medical records review concluded that Mr. Carter was totally disabled after he began the interferon treatment in May of 2007.  *Ryan Report* .

<u>A<small>RGUMENT</small></u>

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See* **White v. York Intern. Corp.**, 45 F.3d 357, **360** (CA10 [W.D. OK]1995). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is contradictory. **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, **248** (US [CA D.C. 1986).

<u>P<small>LAINTIFF'S</small> ADA C<small>LAIM</small></u>

A prima facie case of ADA discrimination consists of three elements: the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.  **Zwygart v. Bd. of County Comm'rs**, 483 F.3d 1086, **1090** (CA10 2007).

The analysis undertaken to determine whether an individual has a disability under **42 U.S.C. § 12102(2)(A)** requires a three-step process: (1) the determination of whether Carter's Diabetes, Hepatitis C and Fibromyalgia constitute a physical impairment, (2) the identification of

the life activity or activities upon which Carter relies and the determination of whether they constitute a major life activity under the ADA, and (3) finally the inquiry turns to whether the impairment substantially limited the major life activity or activities asserted. ***MacKenzie v. Denver, City and County of***, 414 F.3d 1266, ***1275*** (CA 10 [CO] 2005).

For purposes of paragraph (1), the definition of a physical impairment also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. The Plaintiff's diseases affect the digestive system and the circulatory systems. *See Dr. Cummings Unsworn Declaration, Appendix Nine*. They qualify as physical impairments under the ADA.

The term "disability" means, with respect to an individual ". . .a physical or mental impairment that substantially limits one or more of the major life activities of such individual." ***42 USC § 12102(a)(1)(A)***. The term "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." ***29 C.F.R. § 1630.2(I)***. Sleeping and lifting are major life activities. ***Pack v. Kmart Corp***, 166 F.3d 1300, ***1305*** (CA 10 [OK] 1999). The Plaintiff's Occupational Therapist has testified in the report attached to his sworn declaration, that Dennis Carter was significantly impaired when compared to the general population in his ability to care for himself, perform manual tasks, walking, sleeping, lifting and performing work. It is clear that "caring for oneself," "performing manual tasks," "walking," "sleeping," "lifting" and "working" are major life

activities as defined in the regulations implementing Title I of the ADA and the case law.  It is also clear that there is a factual basis to support the Occupational Therapist's conclusion that Mr. Carter was substantially limited when compared to the general population in the performance of these life activities.  His friends were doing his shopping, cleaning his house, doing his laundry, helping him get in and out of the shower, they were even feeding him.  His ability to work was limited by the fact he was unable to work more than ten days a month.  The rest of the month he spent in bed.  The Occupational Therapist in his report proceeds with the analysis of Plaintiff's ability to work in a class of jobs and a broad range of jobs in various classes pursuant to *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, *2151* (CA 10 [CO] 1997) to show that Plaintiff was substantially limited in his ability to work in either a class of jobs or a broad range of jobs in various classes without accommodation.

Pathfinder Energy touts that Plaintiff's failure to have access to his medication during a period of the fall of 2006 means that he could not be disabled.  This theory arises under *Sutton's* now discredited holding that the ameliorative effects of mitigating measures must be considered to determine if a person is significantly impaired.  Carter's disability in late 2006 was the product of Diabetes and Hepatitis C and the Hepatitis C was playing the most significant role in his disability, against which his Diabetes medication would have had no ameliorative effect.  Furthermnore, it is complete speculation to say Carter's Diabetes would have been stabilized with medication. We know that today, Carter remains completely disabled even though he began taking his Diabetes medication again in December of 2006. *See Carter Depo page 81, lines 20-23; and Ryan Unsworn*

*Declaration, Expert Witness Report- Appendix Nine.*  It is clear that his Diabetes is disabling  with or without the ameliorative effects of medication, and that the Hepatitis C was disabling him in the fall of 2006.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*.

Dennis Carter was able to work as a directional driller on a reduced schedule at the time he was fired.  He had just finished a job lasting ten days working 24 hour shifts.  What he needed was rest between jobs.  This accommodation had worked for at least two months.  Mr. Arnold knew this when he sent Carter on the Ultra job on the 23rd of December, 2006.

Failure to Accommodate:

A Defendant discriminates against a qualified individual on the basis of a disability by:   . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; . . . (Emphasis added).

*42 USC § 12112(b)(5)(a)*.

One of the known limitations of Plaintiff's disability was that his fatigue and physical distress made him "grouchy."  Any minor dust-ups in the field, particularly those that wouldn't merit a gross misconduct claim could certainly have been accommodated through a fair application of the discipline policy.   Rich Arnold was aware that Mr. Carter's diabetes was causing  him serious health problems, and knew in early December that something was wrong with his blood and he was

undergoing testing to determine what it was.  Mr. Arnold had agreed to cut down his hours, and to

supply him with a relief driller.  These accommodations did not cause an undue hardship.

The employer does not have to be satisfied that a person is disabled to trigger the duty to

accommodate.  All that is required is that the employer know the employee has limitations.

> For purposes of proving ADA discrimination, it is important to distinguish between an
> employer's knowledge of an employee's disability versus an employer's knowledge of any
> limitations experienced by the employee as a result of that disability. This distinction is
> important because the ADA requires employers to reasonably accommodate limitations, not
> disabilities. . . The term 'discriminate' includes ... not making reasonable accommodations
> to the known physical or mental limitations of an otherwise qualified individual with a
> disability...." 29 C.F.R. 1630.9, App. (1995).

*Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, *164* (CA 5, 1996).

The accommodation here would have been as simple as allowing the Plaintiff enough time

off work to clarify with his physician what was wrong with him.  He met with his physician the day

before he was fired, and learned earlier in the month that something was wrong with his liver. In

fact, his doctor diagnosed Hepatitis C in January of 2007, just a few weeks away.  In just six months,

Plaintiff would be receiving Interferon treatment and from that point on was unable to work.

The regulations implementing Title I of the ADA are entitled to deference in light of

Congressional directive to the EEOC to implement Title I.  The Court sitting *en banc* in *Smith v.*

*Midland Brake, Inc.*, 180 F.3d 1154, *1165 fn 5* (CA 10 [KA] 1999) so observed and

then commenting on the appendix to the regulations stated they "constitute a body of experience and

informed judgment to which courts and litigants may properly resort for guidance." *Id.* quoting

*Meritor Savings Bank v. Vinson*, 477 U.S. 57,  106 S.Ct. 2399 (US 1986).  Those

guidelines contemplate ". . . the use of accrued paid leave or providing additional unpaid leave for necessary treatment." **Hudson v. MCI Telecommunications Corp.**, 87 F.3d 1167, **1168** (CA 10 [CO] 1996). In **Rascon v. US West Comm.**, 143 F.3d 1324 (CA 10 [NM] 1998), the Tenth Circuit held that five months of unpaid leave was not an unreasonable accommodation for treatment.  In this case, all Dennis Carter asked for was a few weeks to get back to his doctor and obtain a letter that would permit him to take short term disability benefits, and when appropriate convert to long term disability benefits.

It is important to note, that the act of terminating the Plaintiff because he was not able to work the same hours as the other men was itself an act of discrimination in violation of **42 USC § 12112(a) and 12112(b)(4)**.  In other words, Plaintiff's ADA claim does not rest alone on a failure to accommodate but is based also on the termination of the Plaintiff because he could not work the same hours as the other men.

### THE SOCIAL SECURITY APPLICATION

The Plaintiff applied for social security benefits.  On an unsigned application for benefits Plaintiff apparently provided information that he was unable to work after 12/27/06.  Plaintiff will file a motion to strike this entire appendix, since it has not been properly introduced in the record. Assuming *Arguendo*, that the application will be received, Mr. Carter didn't work after 12/27/06 and believed that because he could only work nine or ten days a month during that period that no one would hire him.  *See Carter Declaration*.  In fact, Mr. Carter was unable to work without accommodation after 12/27/06.  The Supreme Court has recognized that a declaration under the

SSDI scheme may exist side by side with the establishment of a qualified disability under the ADA. *Cleveland v. Policy Management Systems Management Systems Corp.*, 526 U.S. 795, *802-803* (US [CA 5] 1999).

***THE PRETEXT ISSUE***

In this case, the *McDonnell Douglas* burden shifting rule applies.  The Plaintiff has stated a prima facie case for meeting the elements of discriminatory discharge under the ADA.  The Plaintiff has alleged that he was a qualified individual with a disability.  He has also alleged that he sought and was denied an accommodation in the form of a simple request for time off to obtain treatment.  At the time this request was made he was fired, which was itself an act of discrimination in violation of the ADA.  The reasons given for this dismissal were that Plaintiff committed gross misconduct by hanging up on Mr. Arnold three times, and telling and MWD hand "F you" on his last day at work.  Plaintiff's burden of production is then to demonstrate that the proffered reason for the termination is pretextual under McDonnell Douglas. *Reeves v. Sanderson Plumbing Products*, 120 S.Ct. 2097, *2106* (US [CA 5] 2000).  "A claim of pretext need not be supported with direct evidence, but may be based on " weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *Turner v. PSC of Colorado*, 563 F.3d 1136, *1143* (CA 10 [CO] 2009).

To meet that burden, the Plaintiff has demonstrated:

1.      He did not hang up on Rich Arnold even once.  He simply ended a conversation that

was over without saying goodbye on the 23rd of December.

2.  He did not confront the MWD hand, he was too sick and tired for that, he merely used the F word, not uncommon in the oilfield, when he said it didn't matter to him where he slept.

3.  As Mr. Arnold said in the meeting on the 27th - Plaintiff couldn't work 25-26 days a month like the rest of the drillers and he was afraid they were going to quit.

4.  In the same meeting, Arnold said "Well, you can't work 24 hour shifts, so there you go."

5.  Plaintiff had previously stated he would produce a letter from his doctor that he couldn't work at that time, and that his disability benefits couldn't be taken from him.

The finder of fact is entitled to consider whether the Plaintiff's proof justified even a verbal warning under the company's disciplinary policy.  Plaintiff has put forth evidence that directly challenges the veracity of the Defendant's position, and offered evidence that the real reason for the termination was that the Plaintiff could not work the same hours as the other men, and that he would be accessing his disability benefits.  If the trier of fact believes the Plaintiff, and his evidence, the employer's justification has been eliminated.  Pretext, at the summary judgment stage requires examining the Plaintiff's proof on its face, without any credibility assessment.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  ***Reeves v. Sanderson Plumbing Products***, 120 S.Ct.at ***2106***.

In the context of a wrongful discharge the **McDonnell Douglas** paradigm requires proof that:

1.     The Plaintiff was terminated.

2.     That at the time of the termination, Plaintiff's job performance was satisfactory.

3.     That there is some additional evidence that the termination decision was based on discrimination.

**Defreitas v. Horizon Investment Management Corp.**, 577 F.3d 1151, **1162** (CA 10 [UT] 2009).

There is a strong temporal nexus between the declining health of the Plaintiff and the termination.  There is a strong temporal nexus between the Plaintiff's need for disability benefits and the termination.  The proffered reasons the Plaintiff was terminated were pretextual.  Finally, Mr. Arnold himself made several statements supporting Plaintiff's inference that he was fired because of his declining health and its impact on his productivity to the company.

### *THE ERISA CLAIM*

The Defendant's disability policy is a company welfare plan governed by ERISA.  The plan is maintained to qualify for ERISA benefits under both **29 USC § 1001 et. seq**. and the Internal Revenue Code.

Section 510 of the ERISA protects persons from employment actions that are designed to prevent them from gaining access to their benefits.  Disability benefits are covered under ERISA. **Intermodal Rail Employees Assn v. Atchison, Topeka and Santa Fe Railway Co.**, 117 S.Ct. 1513 (US [CA 9] 1997).  Section 510 reads:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan. . .

In order to recover under section 510, an employee must show that the employer terminated him with the specific intent to interfere with his ERISA rights. ***Trujillo v. PacifiCorp***, 524 F.3d 1149, ***1160*** (CA 10 [WY] 2008). Plaintiff may satisfy this burden by either presenting direct evidence of interference with his protected benefits or by utilizing the burden-shifting analysis of ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); ***Garrett v. Walker***, 164 F.3d 1249 (CA 10 [CO] 1998). If the Plaintiff relies upon the burden-shifting approach, Plaintiff may establish a prima facie case of interference by demonstrating that he (1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to discriminate against him was present. ***Salus v. GTE Directories Service Corp.***, 104 F.3d 131, ***135*** (CA 7 [S.D. IL] 1997).

> Once the plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the challenged employment action. See id. If the defendant presents a legitimate reason, the burden then shifts back to the plaintiff to demonstrate that the proffered explanation is pretextual and that the "motivating factor behind the termination" was the specific intent to interfere with the plaintiff's ERISA rights.

***Id.***

The entire array of the tools for determining pretext and for demonstrating discrimination in Title VII, the ADEA and the ADA are available to the ERISA Plaintiff in this context. ***Reeves v. Sanderson Plumbing Products***, 120 S.Ct. at ***2106***. The argument for pretext here is

identical to the argument under the Plaintiff's ADA claim.  Each of the reasons advanced to

demonstrate that the Plaintiff's termination was non-discriminatory can be shown to be pretextual.

It is clear that the Plaintiff made specific reference to his need for his disability benefits at the time

he was fired.  The Plaintiff is entitled to present the ultimate question of discrimination to the fact

finder.

### PLAINTIFF IS ENTITLED TO THE RELIEF AFFORDED UNDER § 510

There is no question that § 510 has the reach to protect persons in the Plaintiff's position who

have been discriminated against in order to prevent them from attaining a benefit to which they

could have become entitled under the plan. *Garratt v. Walker*, 164 at *1253*. While Plaintiff

has not specifically requested affirmative relief in his complaint, that is the relief afforded under §

510, and the Plaintiff is entitled to whatever affirmative relief the Court may fashion if the fact

finder determines that discrimination has taken place.  Pursuant to *Rule 54(c) FRCP*, the Court

is required to "grant the relief to which each party is entitled, even if the party has not demanded that

relief in its pleadings."

### PLAINTIFF'S EMPLOYMENT WITH PATHFINDER INCLUDED THE PROVISION THAT HE BE TERMINATED IN ACCORDANCE WITH THE COMPANY'S DISCIPLINARY POLICY

There are two types of employment contracts: 1) express contracts created orally or

in writing at the time of employment; 2) and implied-in-fact employment contracts which

arise from a "mutual agreement and intent to promise which is found in the acts or conduct

of the party sought to be bound." *Wilder v. Cody Country Chamber of Commerce*,

868 P.2d 211, 216 (WY 1994).

Wyoming recognizes that the employee manual will supply terms for an implied-in-fact contract. *Sanchez v. Life Care Centers of America*, 855 P.2d 1256, *1257* (WY 1993); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, *217* (Wy 1994). When an employee manual contains a disciplinary policy with graduated steps for enforcing discipline, the employer loses the unfettered right to discharge an employee without cause. *Sanchez v. Life Care Centers of America*, 855 P.2d at *1257*. Where the handbook's discipline policy provides a structure for handling discipline, "[T]he handbook's provisions change the appellant's unfettered right to discharge appellee at any time and without cause. Such provisions create an expectation on the part of an employee that they will be followed . . ." *Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, *707* (WY 1985). "In particular, a systematic discipline procedure or other language in an employee handbook implying termination may be for cause only may defeat the rebuttable presumption that employment is at will." *Lincoln v. Wackenhut Corp.*, 867 P.2d 701, *703* (WY 1994).

"A valid, conspicuous, and unambiguous disclaimer notifying employees of their at-will employment status can preclude a progressive discipline policy from forming an implied contract." *Worley v. Wyoming Bottling Company, Inc.*, 1 P.3d 615, *621* (WY 2000). Whether or not a disclaimer is valid is determined as a matter of law. *McDonald v. Mobil Coal Producing, Inc.*, 820 P.2d 986, *988* (WY 1991). In order for a disclaimer to be valid it must be conspicuous, the language should be set off by a border or larger print, it should be capitalized,

and its placement should invite attention that is appropriate to its significance.   ***Jimenez v.***
***Colorado Interstate Gas Co.***, 690 F.Supp 977, ***989*** (D. Ct. WY 1988); ***McDonald***
***v. Mobil Coal Producing, Inc.***, 820 P.2d at ***890-1***.

In this case, the disclaimers are hidden in the middle of pages under titles that have nothing
to do with the assertion of an at-will disclaimer. The language of the disclaimer is inconsistent with
the specific promises made in the discipline policy that the discipline policy will be applied to all
employees, that its application is mandatory, and the employee will be given the opportunity to
correct problems before being terminated.

A review of the receipt form and Introduction to the handbook reveals that the disclaimer
does not occupy a paragraph of its own, is not set out conspicuously in any way, but rather is placed
in paragraphs that contain a collection of miscellaneous information. In the application for
employment, the "at will" disclaimer is buried in the paragraph entitled "Authorization" which
generally allows the company to conduct background checks. There is no effort to draw attention
to any of the disclaimers by placing a border around them, capitalizing them or setting them under
a specific heading that draws attention to their import. The Wyoming Supreme Court has concluded
as a matter of law such failings render the disclaimer ineffective. ***Worley v. Wyoming***
***Bottling Company, Inc.***, 1 P.3d at ***621***.

Furthermore, the administrative assistant for Pathfinder flipped through the documents
pointing out where Mr. Carter needed to sign without allowing him the opportunity to review the
documents. Plaintiff signed approximately nineteen documents and received the employee
handbook, the code of conduct along with many other policies of Pathfinder in about 30 minutes.
Mr Carter estimated it would have taken a day to read the documents.

Since Carter had been hired based on his previous employment as a contract driller he did

not fill out the employment application with the bolded disclaimer hidden in the paragraph on

authorizations until three days after he had come to work for the company.  Thus, under the rule

announced in ***Brodie v. General Chemical Corporation***, 934 P.2d 1263, ***1268*** (WY

1997) he should have received additional consideration for any effort to change the implied-in-fact

contract created by the disciplinary policy of the handbook.

### *Conclusion*

The Plaintiff has shown material facts to support the claims of violation of the ADA, ERISA

and breach of a state law implied-in-fact employment contract.

Dated this Monday, September 28, 2009.

_____-S-_____

*Jeff Gosman, of counsel*
CHAPMAN VALDEZ and of
**GOSMAN LAW OFFICE**
*125 S. Second Street*
(307) 265-3082 (ph.)
(307)-265-6715 (fax.)

### *Certificate of Service*

I hereby certify that true and correct copy of the foregoing was served this Friday,
October 29, 2010 by *e-submission* to the following parties in interest:

| Christopher Moore<br>Coats Rose<br>400 Poydras, Suite 1440<br>New Orleans, Louisiana 70130<br>cmoore@coatsrose.com | Christine M. White<br>Coats Rose<br>400 Poydras, Suite 1440<br>New Orleans, Louisiana  70130<br>cwhite@coatsrose.com | Bradley T. Cave, P.C.<br>Holland & Hart LLP<br>2515 Warren Avenue, Suite  450<br>Cheyenne, WY 82001<br>bcave@hollandhart.com |

_____-S-_____

Anita Schroeder